IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JUDY G. LEACH                                                    PLAINTIFF

        v.                        Civil No. 04-5299

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                  DEFENDANT

## MEMORANDUM OPINION

Plaintiff Judy G. Leach brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of the Social Security Administration denying her

application for disability insurance benefits (DIB) under the provisions of Title II of the Social

Security Act.

**Procedural Background:**

On July 9, 2000, Leach filed an application for DIB benefits. (Tr. 50-52). Leach alleged

a disability onset date of March 31, 1999, due to a fragmented disk in her back and rotator cuff

syndrome in her right shoulder. (Tr. 71).

An administrative hearing was held on July 2, 2002 (Tr. 334-374 ). Leach appeared and

testified. (Tr. 338-365). Michael Lala, a vocational expert, was also called to testify. (Tr. 365-

374). Leach was represented by counsel. (Tr. 336).

By written decision dated August 29, 2003, the administrative law judge (ALJ) found

Leach not disabled within the meaning of the Social Security Act. (Tr. 13-24). He concluded

she had an impairment or combinations of impairments that was severe including right shoulder

impingement syndrome and a herniated lumbar disk. (Tr. 18). However, after reviewing all of

the evidence presented, he determined that plaintiff's impairments did not meet or equal the level

-1-

of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation 4. (Tr. 18).

The ALJ found Leach had the residual functional capacity (RFC) to engage in a wide range light work. Specifically, he found she could lift and/or carry 20 pounds occasionally and ten pounds frequently, be on her feet for at least two hours of an eight-hour workday, and sit about six hours of an eight-hour day. (Tr. 21). With respect to non-exertional (non-mental) limitations, the ALJ found Leach would have to alternate sitting and standing, she could occasionally climb stairs, never crouch, crawl, or stoop, she could no more than occasionally reach away from her body at arm's length or work overhead, and she should avoid temperature extremes and vibration. (Tr. 21). He found no mental limitations. (Tr. 21).

Plaintiff appealed the decision of the ALJ to the Appeals Council. (Tr. 11). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Leach's request for review. (Tr. 7-10).

**Evidence Presented:**

At the hearing before the ALJ, Leach testified she was forty-seven years old and had a high school diploma. (Tr. 338). She also had been a licensed cosmetologist and was licensed to sell life insurance. (Tr. 338-339).

Leach testified she lives in a house with her husband. (Tr. 343). Leach indicated she pretty much stays home except for going to church weekly. (Tr. 344-345).

She testified she prepares quick meals in the microwave. (Tr. 345). She does not work in the yard and only occasionally runs the vacuum. (Tr. 345). However, Leach testified she can't vacuum the whole house because the back and forth motion causes her pain to escalate. (Tr.

AO72A
(Rev. 8/82)

350). She doesn't have any hobbies but spends her time reading, listening to books on cassette, walking around in the yard, and sitting on the porch. (Tr. 346).

Leach testified she has four grandchildren but they get on her nerves. (Tr. 347). She indicated she can't handle them more than thirty or forty-five minutes at a time. (Tr. 347). Usually, only two of the grandchildren are there at a time. (Tr. 347).

In the last fifteen years, she had worked at the Wal-Mart warehouse. (Tr. 339). She occupied a number of different positions over the course of working at Wal-Mart. (Tr. 339-340). Leach alleged a disability onset date of March 31, 1999, due to an on-the-job back injury. (Tr. 342-343).

She indicated she had injured her back in 1993 and was off work for a year. (Tr. 364). She had surgery on her back and recovered well. (Tr. 364). She went back to work for a period of time. (Tr. 364).

Although Leach drove to the hearing, Leach testified she has problems driving at times because of blurred vision. (Tr. 342). The longest period of time she had driven since March of 1999 was probably the forty-five minutes it takes to get from Rogers to Fayetteville. (Tr. 343).

Leach indicated she wears glasses and can't see without them. (Tr. 356). However, even when wearing the glasses, she indicated there are times when her eyes do not focus and her vision is blurry. (Tr. 356-358). She indicated this happens several times a week. (Tr. 356). During one of the episodes, she can still see good enough to distinguish between a man and a woman, to distinguish objects a person is holding, to take down a number, and to move about her home. (Tr. 358-359). When this occurs, she just normally shuts her eyes and takes a nap. (Tr. 357).

AO72A
(Rev. 8/82)

Leach testified she takes naps everyday. (Tr. 362). She sometimes takes both a morning and an afternoon nap but there are days she sleeps almost all day. (Tr. 362). In an average week, Leach indicated she probably sleeps all day long one to two days. (Tr. 363).

Leach testified she would not be able to work because she has a tremendous amount of pain. (Tr. 347). She indicated part of her problem was in her rotator cuff in her right shoulder and the pain from that goes up into the base of her neck. (Tr. 348). She also indicated she has pain across her back, all the way down her right leg, and to her toes. (Tr. 348-349). Leach stated her right toes are numb (or actually there was a tingling awareness) and she could not move her toes other than her big toe on her right foot. (Tr. 349 & 353). She indicated her toes also sometimes cramp up. (Tr. 353). She testified her whole right side was weak and she stumbled easily whenever she was walking. (Tr. 349).

She occasionally, about once a month, uses a stick for extra support when walking around the yard. (Tr. 355). She has fallen once when she didn't see a curb. (Tr. 356). She also changed vehicles so she sat up higher and they put in a higher stool in their home bathroom so she didn't have to sit down so low. (Tr. 365).

If she stands for a very long period of time, Leach testified it becomes painful and she has to sit down. (Tr. 354-355). She has the same problem if she sits too long or walks too long. She indicated her doctor put a twenty minute restriction on standing, sitting, or walking. (Tr. 354-355). She has also been told that she is not supposed to work in a bent over position. (Tr. 361).

Leach testified that if she walks for twenty minutes, she has to sit down and take a break. (Tr. 359). Standing bothers her after about fifteen minutes. (Tr. 359-360). Leach testified she could probably sit in a chair for an hour or so before she had to move around. (Tr. 360). Leach testified she could probably lift twenty five pounds one time. (Tr. 360).

-4-

Leach testified that when she tries to write a letter her handwriting starts to become very shaky and if she is going to write normally she has to split it up. (Tr. 349). After she has written about four pages, Leach indicated her handwriting becomes almost illegible. (Tr. 349).

To raise her right arm up or lift it overhead, Leach testified that she has to use her other hand to hold her arm up. (Tr. 351). Leach testified she could get her right arm up without using her left hand but she could not doing anything with it. (Tr. 351). Leach indicated she had been told by her doctor not to do any overhead lifting, or repetitive motion (bending, twisting, or lifting), or to lift over five pounds, and to avoid environmental hazards. (Tr. 351 & 363-364).

Leach testified she could bend enough to touch her knees but could not bend enough to touch her toes. (Tr. 351). She can use her left hand to reach up and do things such as screw a light bulb in. (Tr. 351-352).

Leach indicated her pain was sometimes a dull ache and other times a sharp, throbbing pain. (Tr. 352). She testified there were times, probably once a week, when the pain kept her from doing anything and she used heat on her back. (Tr. 352). Leach indicated she has been told she would need two additional surgeries at some point--one to remove a herniation in her back and the other a fusion. (Tr. 361). She testified the doctor was holding off as long as possible on the surgeries because he was afraid arthritis would set in. (Tr. 361).

Leach indicated she had not had a marital relationship with her husband since 1999. (Tr. 363). She also socializes less than she used to. (Tr. 363).

Finally, Leach testified she had been suffering from depression. (Tr. 361). She indicated she had been diagnosed a little over a year ago. (Tr. 361). At that point she wanted to take her life, however, she was put on medication and that helped. (Tr. 361).

-5-

Michael Lala, a vocational expert, testified that Leach had some transferrable skills from her jobs as inventory and claims clerk and a retail cashier. The transferrable skills he identified were: working in filing systems, completing forms, clerical kinds of tasks and records keeping, working with financial instruments, making change, operating cash registers, and operating charge machines. (Tr. 366-367).

Lala was asked to consider an individual with the same vital statistics and vocational profile as Leach. Lala was then asked to assume that such a hypothetical person could lift fifty pounds maximum and twenty pounds frequently. (Tr. 367). If this was the only limitation, Lala testified the person could perform Leach's past relevant work. (Tr. 367).

If the restriction of no overhead work with the right arm and no repetitive motion with the right arm was added, Lala indicated it would eliminate some parts of the past relevant work but other parts would remain. (Tr. 367). Specifically, he testified it would eliminate order picker and warehouse worker. (Tr. 367). Lala indicated there would also be other jobs the person could perform such as storage facility rental clerk (unskilled light level), office helper (unskilled light level), and charge account clerk (unskilled sedentary). (Tr. 367-369).

If the restriction was added to that "no frequent prolonged extreme or pressure, bend or twist," Lala indicated this would have no impact on the remaining past relevant work or the jobs he identified. (Tr. 369). If a twenty pound lifting maximum, ten pounds frequently, was added, Lala indicated this would eliminate the medium level jobs but would level the light and sedentary examples. (Tr. 369). Lala indicated the identified jobs were merely representative jobs. (Tr. 369).

The ALJ then asked the following new hypothetical:

-6-

The lifting limit five to 10 pounds up to 25 pounds infrequently and that has been defined as eight times within eight hours. No prolonged sit, stand, no work in bent over position; no repetitive bend, lift or twist; frequent breaks, frequent position change; 20 minute limit for sitting, walking before position change; no vibrational activity; no climbing. Avoid environmental hazards or noxious fumes or chemicals.

(Tr. 369-370). Given this hypothetical, Lala concluded the individual could not return to Leach's past relevant work. (Tr. 370). Lala testified the jobs he mentioned would also be out as would any other jobs. (Tr. 370).

Lala was then given another hypothetical with the only limitations that the individual could lift a maximum of twenty pounds and could sit two hours in an eight hour work day. (Tr. 370-371). Lala indicated this would leave a large range of light, unskilled work available. (Tr. 371). Leach's past relevant work would not be available. (Tr. 371).

Lala was next asked to assume:

Lift no more than 10 pounds and it says minimize bending and twisting at the waist and I would understand that that would mean no frequent, prolonged or extreme bend or twist. And it says go from sitting to standing to walking. Okay. I would understand this to mean, need to be able to alternate position from time to time.

(Tr. 371).

Lala testified that if the position change allowed for enough time to complete basic work activities, that it would not allow for the past work except for work as a claims clerk. (Tr. 371). He testified that "[i]f the position change was so frequent that for example, 15, 20 minutes work activities can't be completed there would be no work." (Tr. 371).

Finally, Lala was asked to assume:

No lifting over five pounds, no repetitive motion, and this has to do with the one arm and shoulder as I'm understanding it. The right shoulder, in other words, cannot lift over five pounds with the right arm and no repetitive motion with the right arm.

-7-

(Tr. 372). Assuming this person could stand long enough, Lala testified there would be a limited range of light, unskilled work where the job was classified as light not because of lifting but because of the standing. (Tr. 372). Lala indicated these would be one armed jobs that could be performed by a storage facility rental clerk or an officer helper. (Tr. 372). Lala indicated sedentary jobs would be out. (Tr. 373).

The record contains the following medical and vocational evidence. In August of 1993, Leach had a sudden onset of back pain and radicular symptoms related to minor trauma. (Tr. 229). On September 9, 1993, she underwent a microscopic diskectomy, L5-S1 on the right. (Tr. 230-232).

By November of 1993, Leach had developed evidence of an epidural scar and had residual neuropathic pain in the S1 distribution. (Tr. 236). She was treated with epidural lysis of adhesions and epidural steroid injections. (Tr. 236).

On May 28, 1998, Leach was seen by Dr. Hugh Donnell complaining of recurrent pain since returning to work. (Tr. 238). His assessment was recurrent L5 radiculopathy. (Tr. 238). He made a recommendation that Leach lift less than twenty pounds on a routine basis. (Tr. 238 & 240). He also recommended that she be put on a job where she could do some sitting. (Tr. 238 & 240).

On June 19, 1998, Leach was seen by Dr. Cyril Raben complaining of low back and right leg pain. (Tr. 225). She had not been seen by Dr. Raben since 1993 when she had a laminotomy/discectomy. (Tr. 225).

Dr. Raben's clinical notes indicate Leach had taken approximately two years off work and they returned to a sedentary type job in the claims department and had been doing well in that position. (Tr. 225). Shortly after she started working a light duty job in the warehouse, she

-8-

experienced an exacerbation of back and right lower extremity pain and returned to see Dr. Raben. (Tr. 225).

Upon examination, Dr. Raben noted Leach had some pain and tenderness on palpation of the lower lumbar spine. (Tr. 226). Most of her pain appeared to be on palpation of the posterior superior iliac spine on the right. (Tr. 226). His assessment was: (1) low back pain with signs of old S1 nerve root problem; (2) history of previously operated spine; (3) probable degenerative disc disease especially of the L5/S1 interval. (Tr. 226).

On July 11, 1998, Leach was seen by Dr. Raben. (Tr. 224). Her examination showed some pain and tenderness on palpation of the lower lumbar spine, paraspinous musculature and facets. (Tr. 224). She was prescribed Ultram. (Tr. 224).

On March 29, 1999, Leach was seen by Dr. Raben complaining of a constant ache and numbness in her shoulder, low back and right lower extremity. (Tr. 223). Leach had been working full time and had not been seen by Dr. Raben since July of 1998. (Tr. 223). Leach reported she had been doing well until she was forced to take a new position at work where she had to do a lot of bending, twisting, and lifting. (Tr. 223).

On April 3, 1999, Dr. Raben noted that an MRI scan showed a small central and right paracentral disc herniation at L4/5 with a minimal bulging annulus at L5/S1. (Tr. 220 & 221-222). The MRI also indicated a possible extruded fragment of a disc. (Tr. 220). Leach had a positive straight leg raising and positive seated root test. (Tr. 220).

An MRI of Leach's lumbar spine on April 1, 1999, indicated a small central and right paracentral focal disc protrusion at the L-4/5 lumbar level resulting in deformity upon the anterior thecal sac and mild central and right lateral recessed stenosis. (Tr. 196). The adjacent exiting nerve root also appeared to be mildly compromised. (Tr. 197). It also revealed a minimally

-9-

AO72A
(Rev. 8/82)

bulging annulus fibrosis at the L-5/S-1 level with a prominent central and rightward component not resulting in any significant central or right lateral recess stenosis. (Tr. 197). It was noted a 3 to 4mm hypodense structure with signal characteristics similar to disc was seen at this level lying just medial to the exiting right S-1 nerve root which was suspicious for a free sequestered disc fragment. (Tr. 197). All remaining lumbar levels were unremarkable. (Tr. 197).

On April 6, 1999, Leach was examined by Dr. Gary Moffitt. (Tr. 242-243). Upon examination, he noted no tenderness to palpation in Leach's lower back and no muscle tightness. (Tr. 242). He indicated she had normal reflexes in the knee region bilaterally, however there was an almost imperceptible ankle jerk on the right, but normal ankle jerk on the left. (Tr. 242). She had a weak extensor hallucis longus on the right but negative straight leg raises. (Tr. 242). She could heel walk but had some trouble toe walking. (Tr. 242). Dr. Moffitt indicated Leach should be able to return to work but should not lift, push, or pull with greater than ten pounds of force. (Tr. 243). He also indicated she would need to minimize bending and twisting at the waist and would need to go from sitting, standing to walking on an as needed basis. (Tr. 243).

In April of 1999, Dr. Raben referred Leach to HealthSouth Rehabilitation Hospital for epidural catheterization and lysis of adhesions, epidural steroid administration of Depo-Medrol, and physical therapy. (Tr. 146-173). She was seen by Dr. William Money who diagnosed her as having lumbar degenerative disease at 5-1, epidural adhesions and peridural scarring. (Tr. 157). She underwent a series of three epidural steroid injections. (Tr. 155-157).

At her initial physical therapy evaluation on May 7, 1999, Leach was complaining of pain in the bilateral lumbar spine with radicular type pain into the right buttock, posterior thigh, and posterior leg to the foot. (Tr. 150). Active range of motion of the trunk was as follows: Flexion–50% of normal; Extension–25% of normal and painful; Right side bending–75% of

-10-

normal and painful; Left side bending–75% of normal; Right rotation–75% of normal and painful; Left rotation–75% of normal. (Tr. 150).

On May 3, 1999, Dr. Raben indicated Leach was doing better with epidural catheterization. (Tr. 218). He indicated he believed Leach would be able to get back to a light and/or sedentary position. (Tr. 218). He stated he was not sure that she would be able to do repetitive bend/lift/twist. (Tr. 218). In fact, he concluded that this could have been "the cause of this extruded disc herniation that gave her right lower extremity pain." (Tr. 218).

On May 24, 1999, a progress report noted that Leach was responding well to the physical therapy program and experiencing a decrease in her overall symptoms with improvement in range of motion and strength. (Tr. 149). A progress report dated June 14, 1999, noted that Leach's back was improving and her active range of motion of the trunk was as follows: Flexion--75% of normal; Extension–within normal limits; Right side bending–within normal limits; Left side bending–within normal limits; Right rotation–within normal limits; and Left rotation–within normal limits. (Tr. 147). Leach did have some slight right lower extremity weakness that was improving. (Tr. 147). The physical therapist's assessment was that Leach had some "nerve root irritation from a disc which is causing her radicular type symptoms." (Tr. 151).

On June 14, 1999, Leach was seen by Dr. Raben. (Tr. 214). She was complaining of an ache that came and went with numbness and tingling in her low back and down her right lower extremity. (Tr. 214). She indicated stairs and bending appeared to make it worse. (Tr. 214).

Dr. Raben concluded Leach was ready to return to work on a light duty or sedentary duty basis. (Tr. 214). He gave her a lifting limitation of five to ten pounds and up to twenty-five pounds one to eight times during an eight hour shift. (Tr. 214). She was to have no prolonged standing or sitting, no working in a bent-over posture, no repetitive bend/lift/twist, frequent

-11-

breaks and frequent change of position. (Tr. 214). He wanted her to be able to change positions every twenty minutes. (Tr. 214). He indicated she should avoid highly vibrational situations, climbing and environmental hazards of noxious fumes or chemicals and electrical hazards. (Tr. 214).

On July 1, 1999, Dr. Raben's office notes indicate Leach was complaining of a constant ache in her shoulder and low back. (Tr. 213). She rated her pain level at a 9 out of 10. (Tr. 213). At the time, Leach was working full-time at light duty. (Tr. 213). Examination revealed positive impingement signs and symptoms. (Tr. 213). He gave her a steroid injection and referred her to Dr. Rodger Dickinson for rotator cuff syndrome. (Tr. 213).

In July and August of 1999, Leach underwent physical therapy for impingement syndrome on her right shoulder. (Tr. 174-176). She reported injuring her right shoulder while at work doing a repetitive activity on the job. (Tr. 176). She indicated a sharp pain developed whenever she would raise her right arm above shoulder level. (Tr. 176). She reported having had the problem since March. (Tr. 176). Although she was experiencing some slight impingement near the A-C joint, it was noted Leach was improving with an exercise program. (Tr. 174).

On July 12, 1999, Leach was given a steroid injection in her right shoulder. (Tr. 189 & 251). On July 26, 1999, Dr. Dickinson noted Leach's shoulder was better and the steroid injection helped. (Tr. 187 & 253). However, on August 11, 1999, Leach reported the shoulder was more painful. (Tr. 187 & 190). An arthrogram was scheduled. (Tr. 187).

On August 18, 1999, Leach's arthrogram was negative for rotator cuff tear. (Tr. 183 & 186). Dr. Dickinson noted Leach still had some restricted range of motion. (Tr. 183). In his opinion she had a persistent impingement syndrome rather than early adhesive capsulitis. (Tr. 183). On September 8, 1999, Dr. Dickinson noted Leach had markedly improved with a much

-12-

better range of motion. (Tr. 182). On October 6, 1999, Dr. Dickinson noted Leach still had signs of impingement and slight loss of range of motion. (Tr. 181). He stated she should avoid any kind of overhead or above motion work. (Tr. 181).

On November 3, 1999, Dr. Dickinson noted that Leach was not improving with anti-inflammatory drugs. (Tr. 180). He noted she had no significant loss of motion passively but had "problems with active, positive impingement zone." (Tr. 180). He injected her shoulder with steroids. (Tr. 180). He noted the injection seemed to help with the pain. (Tr. 180).

On January 12, 2000, Dr. Dickinson noted that Leach was little better and did not have good range of motion. (Tr. 179). He noted she still had some impingement. (Tr. 179). He indicated he would keep her off work for two more months but he believed her best bet was to find a different occupation not involving the same type of repetitive activity she had been doing before. (Tr. 179).

On March 8, 2000, Dr. Dickinson noted Leach's shoulder was much better and she was in much less pain. (Tr. 177). However, he noted she had not been doing anything. (Tr. 177). He indicated Leach could return to work on March 15th but was to have no overhead use of her right arm and no repetitive motion of the right arm. (Tr. 177-178). He indicated Leach had chronic impingement problems in her right shoulder. (Tr. 177). He indicated he believed the avoidance of activities was the best method for her. (Tr. 177).

On May 15, 2000, Leach was seen by Dr. Raben. (Tr. 216). He noted Leach was still having some persistent pain in her low back, right posterior thigh and lateral aspect of her foot that she rated at a two out of ten. (Tr. 216). The doctor noted he still felt she could be released to a light-duty status. (Tr. 216 & 217). However, he repeated the limitations he had given her

-13-

in June of 1999 including the limitation that she not stand/sit/walk for more than twenty minutes at a time. (Tr. 216).

On June 7, 2000, Leach filled out a disability supplemental interview outline. (Tr. 88-92). She listed her weight as 195 and her height as 5' 8". (Tr. 88). She indicated she could bathe and dress herself and take care of her own hair care needs. (Tr. 88). She also indicated she could change sheets, wash the car, and do laundry, the dishes, and vacuum for small periods of time. (Tr. 88). She indicated it was easy to get into a twist and have problems. (Tr. 88). She stated she did very little ironing. (Tr. 88).

She stated she could shop for clothes, do the banking, and go to the post office. (Tr. 88). With respect to getting groceries, she indicated she could push the basket and put the products in the basket but could not get the groceries into or out of the car. (Tr. 88).

She stated she prepared meals two times a week including sandwiches, frozen dinners, meats, vegetables, desserts, and dishes that required a recipe. (Tr. 89). She indicated it took her twenty to twenty five minutes to prepare a meal and took longer since her disability began. (Tr. 89).

She indicated she could pay bills, use a check book, and count change. (Tr. 89). She stated she could drive including driving unfamiliar routes. (Tr. 89). She stated she could not walk for exercise or errands and had a handicap tag. (Tr. 89).

She did not use any assistive devices. (Tr. 89). She spends her time attending church, watching TV, listening to the radio, and visiting friends and relatives. (Tr. 89).

She indicated she suffered from unusual fatigue and had to rest once a day for thirty minutes. (Tr. 90). She described her pain as follows: "I wake up in the night in pain. I get up with pain. I hurt at times through the day." (Tr. 90). She stated the pain was located in her low

-14-

back, right hip, right leg, right shoulder and neck. (Tr. 90). She stated her entire back hurt at times until she could get in a different position or take medication. (Tr. 90). She indicated the pain was almost constant. (Tr. 90).

She stated the pain was caused by doing anything (standing, sitting, walking) too long. (Tr. 90). She stated fatigue caused the pain to worsen. (Tr. 90). She indicated she could stand or walk for twenty minutes and sit for forty-five minutes before the pain occurred. (Tr. 90). She indicated rest and medication helped the pain. (Tr. 90).

Since her disability began, Leach indicated she was not able to do things like she used to and got tired easily. (Tr. 91). She also indicated she did not have a relationship with her husband like she used to. (Tr. 91). On an average day she stated she took care of her personal care needs, ate light meals, did a little laundry or light house work, rested frequently, and checked her e-mail. (Tr. 91). Leach indicated she used to cook more, helped a lady in the nursing home, and walked five miles a day to keep her weight down. (Tr. 91).

On August 30, 2000, a physical residual functional capacity assessment was completed by Dr. Robert Redd, a medical consultant. (Tr. 202-209). With respect to exertional limitations, it stated Leach could occasionally lift or carry fifty pounds; could frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was unlimited. (Tr. 203). No postural, manipulative, visual, communicative, or environmental limitations were established. (Tr. 204-206). It was noted that the symptoms were attributable to a medically determinable impairment. (Tr. 207).

On August 30, 2000, Doug Raines, a case consultant for the Social Security Administration, indicated he believed Leach retained the functional capacity to perform a full

-15-

range of medium work. (Tr. 93). He believed she was unable to return to her past work. (Tr. 93).

On September 18, 2000, Dr. Cyril Raben noted that examination revealed Leach had pain and tenderness on palpation of the cervical spine, paraspinous musculature and facets as well as lower lumbar region. (Tr. 212). He prescribed Ibuprofen and Ultram for pain during the day and an antispasmodic and analgesic for the evening. (Tr. 212).

On October 20, 2000, Dr. Raben noted Leach was complaining of a constant ache and stabbing as well as numbness and tingling in her neck, parascapular region, right hip, and down her right posterior leg. (Tr. 211). Upon examination, Leach had a marked reduction of range of motion. (Tr. 211).

Between October 2000 and May of 2002, Leach was seen by Dr. Todd Simpson for pain management. (Tr. 305-320). On January 22, 2001, Dr. Raben noted Leach had been doing well enough to get back to work and then had a re-injury on the job. (Tr. 210). He noted that a repeat MRI scan showed a recurrent disc herniation. (Tr. 210). Although surgery was an option, both Dr. Raben and Leach wanted to hold off on further surgical intervention. (Tr. 210). They elected to continue conservative treatment. (Tr. 210).

On March 29, 2001, Leach was seen by Dr. Alfred Addington at the Rogers Clinic for Women for her yearly evaluation. (Tr. 276). She reported being depressed. (Tr. 276). Dr. Addington noted Leach had recently lost friends, had family members pass away, and was having some marital problems. (Tr. 276). He prescribed Zoloft. (Tr. 276).

On June 22, 2001, Leach was seen again by Dr. Addington. (Tr. 278). He noted that she was still having problems with depression and although the Zoloft had helped for awhile it was no longer working. (Tr. 278). He gave her samples of Paxil and the number for Ozark Guidance

-16-

Center.  (Tr. 278).  Leach was to get back with the doctor if she had serious depression before she got established with counseling.  (Tr. 278).  Dr. Addington believed the depression was situational.  (Tr. 278).

On May 24, 2002, Leach was seen by Dr. Dickinson complaining of right shoulder pain. (Tr. 304).  Dr. Dickinson noted Leach had chronic right arm pain, a lot of scapular pain with marked limitation of lifting.  (Tr. 304).  He noted she had a pretty good passive range of motion but very significant scapulothoracic pain and limitation.  (Tr. 304).  He stated she had difficulty using her arm out away from the plane of her body and even had problems writing.  (Tr. 304). He indicated she should not lift over five pounds and engage in no repetitive motion.  (Tr. 304).

On September 3, 2002, Dr. Bradley Short examined Leach at the request of the Social Security Administration.  (Tr. 321-322).  He noted: "deep tendon reflexes were 1/4 in the upper extremities related to the biceps, triceps, brachial radialis.  Trace to 1/4 knee jerk.  Right ankle jerk is absent.  Sensation shows subjective diminished sensation to light touch and pinprick in the L4, L5, and S1 distribution in the right lower extremity."  (Tr. 321).  His diagnoses were: failed back surgery syndrome; radiculopathy by history; and chronic pain.  (Tr. 322).

Dr. Short also completed a medical source statement of ability to do work-related activities (physical).  (Tr. 323-326).  He indicated Leach could occasionally lift or carry twenty pounds, frequently lift or carry twenty pounds, stand or walk at least two hours in an eight hour day, and could sit for less than six hours in an eight hour day.  (Tr. 323 & 325).  He indicated Leach had no manipulative or visual limitations.  (Tr. 324).  He stated she could only occasionally climb, balance, or kneel, and should never crouch, crawl, or stoop.  (Tr. 325). Finally he indicated she should avoid hazards such as machinery and heights.  (Tr. 326).

-17-

On January 2, 2003, the ALJ submitted a series of written questions to Michael J. Wiseman, a vocational expert. (Tr. 116-117). The questions were designed to determine if Leach had any transferrable skills or any highly marketable skills, could perform her past relevant work, and whether there were a significant number of jobs in the region where she lived that she could perform. (Tr. 116-117).

Wiseman requested more information on Leach's past relevant work. (Tr. 118). In response, Leach was asked to submit an affidavit describing the work she had performed within the past fifteen years. (Tr. 122). The affidavit was submitted by the plaintiff in March of 2003. (Tr. 124-129).

On April 10, 2003, Wiseman concluded the hypothetical person would be able to perform Leach's past work as a claims clerk. (Tr. 130). Wiseman also indicated the person could perform the following sedentary jobs: clerical mailer; charge account clerk; telephone solicitor; and credit card clerk. (Tr. 130).

Leach's attorney then asked Wiseman to make the following additional assumptions: the claimant is right arm dominant; the claimant could sit less than six hours in an eight hour day; the claimant needs to be able to change position or activity about every twenty minutes which would affect her ability to maintain quota or production standards by at least 10 to 20%; and no frequent repetitive use of the right arm. (Tr. 134). Wiseman was then asked if the hypothetical claimant could perform the past relevant work of the Leach and whether there were a significant number of jobs in the regional economy or in several regions of the national economy which such a hypothetical person could reasonably be expected to perform. (Tr. 134). Wiseman answered no to both questions. (Tr. 135).

-18-

AO72A
(Rev. 8/82)

On May 29, 2003, the ALJ sent a series of questions to Dr. Michael Karathanos. (Tr. 136-137). Dr. Karathanos responded on June 15, 2003. (Tr. 327-328). In his opinion, Leach did not meet or equal a listing but had been limited in her ability to perform work-related activities. (Tr. 328). He noted the limitations had been present from the alleged onset date and continued to be present. (Tr. 328). He stated that pain was a factor limiting Leach's ability to do work and it was felt to be moderate-to-significant and fairly frequent. (Tr. 328).

Dr. Karanthanos completed a medical source statement of ability to do work-related activities (physical). (Tr. 329-332). He indicated Leach could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, could stand two hours in an eight hour workday and could sit about six hours in an eight hour workday but must periodically alternate sitting and standing to relieve pain or discomfort. (Tr. 329-330). He indicated her ability to push or pull in the upper right extremity was limited by her right arm pain. (Tr. 330).

With respect to postural limitations, Dr. Karanthanos indicated Leach should only occasionally climb stairs and should never crouch, crawl, or stoop. (Tr. 330). He also concluded she was limited in her ability to reach all directions including overhead. (Tr. 331). She indicated she should only occasionally be required to reach. (Tr. 331). With respect to environmental limitations, he indicated Leach's exposure to temperature extremes and vibration should be limited. (Tr. 332).

On July 17, 2003, the ALJ sent another series of questions to a vocational expert, A.G. Marlowe. (Tr. 140-141). Marlowe concluded Leach would not be able to do her past work. (Tr. 142). Marlowe indicated that based on the hypothetical the claimant could utilize transferrable skills to perform the following jobs: data entry; typing; order clerk; record clerk; and check

-19-

cashier. (Tr. 143). He also indicated she could do the following unskilled sedentary jobs: order checker; information checker; addressor. (Tr. 143).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3),

-20-

AO72A
(Rev. 8/82)

1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**<u>Discussion</u>**:

Leach argues the ALJ erred in: (1) failing to consider all of her impairments in combination; (2) applying the grid to direct a finding that Leach was not disabled when she suffered from non-exertional limitations including chronic pain and depression; (3) finding she retained the residual functional capacity to perform a wide range of light work; (4) disregarding the opinions and findings of the primary treating physicians; and (5) failing to fully and fairly develop the record.

Leach first argues the ALJ sidestepped the requirement that the claimant's be considered in combination. Although the ALJ acknowledged Leach has severe impairments, Leach maintains he disregarded the medical evidence and testimony regarding her problems with depression and disregarded her testimony regarding vision difficulties.

-21-

With regard to the vision problems, we believe the record clearly shows that the ALJ considered and discussed the evidence offered by Leach in this regard. Before reaching his conclusion regarding Leach's RFC, the ALJ summarized her testimony regarding her vision problems, noted that there was no evidence of any current or past treatment for this alleged impairment, and noted that she had made no complaints to any physician regarding the vision problem. (Tr. 20-21).

With regard to her depression, we note that before he reached his conclusions the ALJ summarized the medical evidence and Leach's testimony. While the ALJ does not specifically mention depression, it was not alleged as a basis of disability in her application and she testified at the hearing that she sought treatment for depression in 2001 and medication was effective in treating it. *See Gregg v. Barnhart*, 354 F.3d 710, 712-713 (8th Cir. 2003)(ALJ is not required to investigate claim not presented at time of benefits application and not offered at hearing as basis for disability). More importantly, there is little evidence of treatment for this condition. As mentioned above, Leach testified the depression was quickly controlled by medication and no counseling or other intervention was needed. (Tr. 276, 278 & 361). *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)(ALJ is not required to discuss all evidence and failure to cite specific evidence does not mean it was not considered).

Leach next argues the ALJ erred in using the Medical-Vocational Guidelines (grids) to determine she was not disabled. However, in this case, the ALJ only mentioned the grids in setting forth the appropriate framework utilized in the five step sequential evaluation process. (Tr. 22). The ALJ did not rely on the grids instead finding that the jobs identified by the vocational expert established that a significant number of jobs existed that a person with the claimant's limitations could perform. (Tr. 22-23).

-22-

We next turn to the ALJ's assessment of plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id.* This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." *Id.*

Leach contends the ALJ erred in determining her RFC because he failed to give proper weight to the opinions of her treating physicians. "[A] treating physician's opinion is given 'controlling weight' if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). However, the "treating physician's opinion do[es] not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995)(internal quotation marks and citation omitted). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders

-23-

inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421

F.3d 785, 790 (8th Cir. 2005)(internal quotation marks and citation omitted).

In the present case, the ALJ had medical assessments prepared by both an examining and

a non-examining agency medical consultant, the treating physician's statements regarding

limitations on Leach's physical capabilities and employability, plaintiff's subjective complaints,

and her medical records. The ALJ set forth the limitations placed on Leach by her treating

physicians, Dr. Raben and Dr. Dickinson and the limitations contained in the medical source

statement completed by Dr. Short and by Dr. Karathanos. (Tr. 19-20). The ALJ then merely

stated that Dr. Raben, one of plaintiff's treating physician's, limited Leach to light work "with

the limitations set out above." (Tr. 21). On June 14, 1999, Dr. Raben, released Leach to return

to very light or sedentary work. (Tr. 214). However, among other things, Dr. Raben noted he

"would only want [Leach] to be at 20 min at a time for sit/stand/walk before she changes

position." (Tr. 214). Again on May 15, 2000, Dr. Raben stated: No prolonged sit/stand. . . . 20

minute limit for sitting/standing/walking before position is changed." (Tr. 217).

When the twenty minute limit for sitting, standing, walking before position change was

added to the hypothetical given to the vocational expert at the hearing, he testified there would

be no jobs that the claimant could do. (Tr. 370). The ALJ did not discuss whether the limitations

set out by Dr. Raben would permit Leach to engage in light work as that term is defined by the

Social Security Administration.[1]   Nor did the ALJ indicate why he discounted Dr. Raben's

---

[1]20 C.F.R. § 404.1567(b) provides: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine

-24-

opinion that Leach would need to change position every twenty minutes or Leach's hearing

testimony that she had to change positions frequently and could only sit, stand, or walk for

extremely limited periods of time. The non-treating physicians did not indicate Leach had to

change position as frequently as Dr. Raben did, however, their assessment cannot alone

constitute substantial evidence if it conflicts with the assessment of a treating physician. *Jenkins*

*v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999).

The ALJ also failed to discuss why he discounted the five pound lifting limitation placed

on Leach by Dr. Dickinson. (Tr. 304). While the ALJ may have had valid reasons for

discounting the limitations listed by Dr. Raben and Dr. Dickinson, the record does not contain

the ALJ's reason for so doing. On remand, a residual physical functional capacity assessment

should be obtained from Dr. Raben or Leach's other treating physicians.

**Conclusion**:

For the reasons stated, the court finds that the decision of the Commissioner denying

benefits to the plaintiff should be reversed and this case remanded for further proceedings. A

separate judgment in accordance with this opinion will be entered.

Dated this 7th day of December 2005.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

---

dexterity or inability to sit for long periods of time." See also Masterson v. Barnhart 363 F.3d
731, 739 (8th Cir. 2004).

AO72A
(Rev. 8/82)